Chief Justice Robertson
delivered the Opinion of the Court.
Henry Clay, vas executor of James Morrison, having sued Thomas I. Garret in detinue for some slaves his testator had bought from Garret, in September, 1818, but permitted to remain in his possession — filed a bill in chancery, enjoining their removal beyond the jurisdiction of the Court, and seeking a nullifaction of a deed of trust made, in 1819, to one Everet, for the indemnity of Henry Daniel and others, as the sureties of Garret to John W. Hunt, and purporting a transfer by Garret, of the legal title to the same slaves and other property.— Daniel and his co-sureties, as well as their trustee, made their answer a cross bill, and, alleging that Morrison, after an absolute purchase of the slaves, had permitted his vendor, Garret, to continue the possessor and ostensible owner of them, and insisting, therefore, that his purchase was per se fraudulent as to themselves, who, as they averred, became Garret’s sureties whilst he was so possessed of the slaves, without notice of Morrison’s claim, and in consideration of an agreement by Garret, to secure their indemnity by the deed of trust after-wards given; and wherefore they prayed for a decree declaring Morrison’s claim void as to them, and subjecting the slaves and other trust property to the satisfaction of the debt for which they were bound to Hunt: unless the Court should relieve them from that debt, on the ground (set up in the cross bill against Hunt also,) that Hunt, having, as they averred, notice of Morrison’s claim to the slaves, had nevertheless, for the fraudulent purpose of inducing them to become bound to him as the sureties of Garret, falsely assured them that he did not know that there was any “lien” on them.
L.
Pending an action of detinue for slaves, the plt'f filed a bill in chancery, to prevent their removal by certain sureties, for whose indemni%tinue had conveyed them to a trustee: these sureties answer, and making their answer a cross bill, allege that, after an absolute sale, (under which the plaintiff claims,) the slaves were permitted to remain with the vendor, who thus held them when they became bound for him; and that the title of the purchaser was, therefore, fraudulent as to them: equity may take jurisdiction of this cross bill— as it would of an original bill for the same object — and settle the question of fraud. And the rights of the sureties will not be determined or affected by a judgment in the action of detinue — to which they were no parties. And —
The. Circuit Court having rendered a decree dismissing Clay’s bill, and exonerating Daniel and his' co-sureties from liability to Hunt, without disposing, otherwise or to any greater extent, of the cross bill, and this Court having reversed the decree against Hunt, and remanded the case with instructions to dismiss the cross bill as to him, and proceed to a full and final disposition of it as to Clay — it was accordingly dismissed as to Hunt, and, after further prosecution against Clay, was dismissed also as to him.
To reverse this last decree, this appeal is prosecuted.
All the material facts not herein already stated, appearing, as they do, in the case’of Hunt vs. Daniel et al, (6 J. J. Mar. 398,) we will not unnecessarily enlarge this opinion by a detailed repetition of them.
We do not doubt the jurisdiction of the Circuit Court. Clay’s bill, praying a decree affecting the right claimed by the appellants, entitled them to litigate, by their answer in the nature of a cross bill, the title to the slaves, and the question of fraud raised by that answer. And, had no such bill been ever filed by Clay, they might have filedan original bill for enforcing their decree of trust and removing the incumbrance thereon, arising from Morrison’s purchase, if, as charged, it was fraudulent.
Nor did the judgment Clay obtained for the slaves, in his action of detinue, conclude the question now raised as to' the alleged fraudulency inlaw of Morrison’s contract, so far as the appellants are concerned; because, though the contract may have been void as to them, still it was not therefore invalid as between the parties to it, and, of course, the matter now litigated could not have been either decided or involved in the action of detinue by Clay against Garret.
And we also feel well satisfied that if, as alleged, Dan-' iel and others became Garret’s sureties in consequence of their belief that he was the owner of the slaves, and of an agreement by him to secure them by a lien, they should be deemed such purchasers as may avoid the pre *184 vious absolute sale of them to Morrison, on the ground that, the possession not having accompanied the title, the sale was, as to them, per se fraudulent; for not only did the deed of trust purport to transfer to their use the legal title, but the consideration was valuable, in fact, as - well as in judgment of law, and should be considered as having been actually paid, because Garret being insolvent, their liability to Hunt is enforcable against them, even though Clay, as Morrison’s executor, may hold the slaves; and it appears that all the other property included in their mortgage, will be insufficient for their indemnity.
If the sureties became bound in consequence of their belief that their principal owned the slaves, and his agreement to secure them, by a lien upon them -they are such purchasers as may impeach the pre vious sale, as per se fraudulent as to them. But if, when they first becam e sureties,they had notice of the sale, equity will not declare it void for their benefit.*
G owed a largo sum to P, who was largely indebted to M. P pledged G's notes to M, as collate ral security; and G, as a security for those notes, gave P a mortgage ‘on certain slaves. After-wards, they all agreed -that M should take the slaves as a purchaser, at their value, and G accordingly conveyed them to him — G and P each receiving an adequate credit upon their respective notes.— The slaves, however, still remained in the possession of G, the vendor, & he afterwards conveyed them to a trustee, as a security for certain others creditors his; and they attack fraudulent and because the possession was not changed to beties: — but held that’ when validity of which was made by G to P. it inured of M, as pawnee of the mortgage debt; and if the subsequent absolute and sale was void at was void only as to theinterest which passed by it (i. e. the equity of redemption;) as, if it was void, it d¿d p°e-exfetfog mortgage, & the would be only to to their former title as mortgage slave” were taken by M, honafide, at their fob- value, which was less than the subsequent mortsum they were mortgaged for, a re-sale for the benefit of the creditors, as gagees, is denied.
*184 If, however, the appellants, when they first bound themselves as Garret’s sureties, had notice of Morrison’s purchase, a court of equity should not declare it void, for their benefit, on the ground of constructive fraud; and . there is no pretence for the imputation of actual fraud. Whether they had, or had not, such notice, we should feel' much perplexity in deciding the one way or the other, and shall not attempt to decide, because, however that fact may be, there is, in our judgment, one ground on which the appellants must fail.
T. H. Pindall having mortgaged to Morrison, as security for a large debt, several notes he held on Garret, and afterwards, in 1816, Garret having mortgaged to Pindall, the slaves now in question, for securing the payment of those notes — Morrison became thus equitably entitled to the benefit of this latter security. And whilst this equitable‘right to substitution subsisted, and both mortgages 'continued in full force, Morrison, Pindall, and Garret agreed that Morrison might have the absolute right to the slaves for a sum equal to the full • value of them, and that he should release Pindall from that amount, and Pindall should also exonerate Garret to the same extent. And, in this way, and this only, Morrison bought the absolute title to the slaves. Having thus paid to Pindall the value of the slaves, Morrison should be considered as standing in the attitude in which Pindall would have stood, had he, in his own right, for a valuable consideration, made his conditional title as mortgagee indefeasable as absolute owner. And *185 had he done so, and, like Morrison, had permitted Garret to retain the possession which he had previously held as' mortgagor, we cannot admit that any creditor or subsequent purchaser of Garret could, in judgment of law, have been otherwise prejudiced than by the transmutation of the conditional into the unconditional title; whereby only so much of the right as was absolute, ,,. ... , , _ _ , could, m our opinion, have been deemed fraudulent as to any such creditor or purchaser; and therefore, by dedaring it alone void, the mortgagee would have been remitted, in equity, to his pre-existent rights under'his mortgage.
Then, Morrison cannot have forfeited his prior rights, as a virtual mortgagee of the slaves, by equitable subrogation; and the utmost consequence to him would have been, that he would not, as against the appellants, have been entitled to hold the slaves absolutely, but might have been compelled to stand as he did before he and Pindall bought the equity of redemption. Certainly, nothing was void or should be avoided for the benefit of the appellants, but the contract whereby Morrison acquired, as against Garret, the absolute title to the slaves.
Indeed, the arbitrary doctrine, that a purchase of the absolute title to personal property, without a change of possession corresponding with the change in the right, shall necessarily be per se fraudulent as to a creditor of, or'a subsequent purchaser from, the continuing posses- , , . — , sor, though it is now too firmly established by the authority of adjudged cases to be judicially overruled, is, , , n r 1 . . , nevertheless, generally felt and admitted to be scarcely consistent with either sound policy or the harmony of legal science; and the most enlightened jurists of this age, therefore, will not apply it to any facts to which it has not been hitherto authoritatively extended.
Whilst we yield to it as far as the adjudged cases have conclusively defined it, we doubt whether both justice and principle would not have been more certainty sub-served, had courts, at first and always, decided that re- ,. - . . , , _ , , tention 01 possession by the vendor, after an absolute *186 saje? should be only prima facia evidence of a fraudulent purpose; and thus have left the question of fraud open to investigation by all the facts which might tend to show the actual intention of the parties. And therefore, we are unwilling to expand the legal rule by applying it, for the first time, so far as we know, to an independent right to which it was never extended by any court. We do not, therefore, feel authorized to identify Morrison’s contract with that kind of purchase which, being unconnected with' any other or previous title to the thing bought, has been subjected to the harsh denunciation of being fraudulent in law, however pure in fact.— Conceding that his absolute title should be postponed as legally unavailing, we cannot concede that his prior equity, or that of Pindall, should also be forfeited.
Equity has no jurisdiction of a legal right of & Unconnected demands against cannot be united in the same bill tho' the def't is ex'or of both. A cross bill can be sustained only upon matters growing out of the original bill.
All that the appellants could, therefore, reasonably claim, would be that Clay and Pindall should be remitted to the simple rights of prior mortgagees.- But, as the appellants came into a court of equity for justice, they cannot be entitled to that which would be nugatory and inequitable; and therefore, as Morrison, in good faith,' paid for the slaves their full value, and the appellants have not been disturbed by him, or by Pindall, in their lien upon any other property mortgaged to them by Garret, and the price allowed by Morrison was not equal to his demand on Pindall, or to that of the. latter on Garret, each of which was secured by mortgage— a decree for -re-selling the slaves would not only be unreasonable and unjust to Morrison, but would be probably, almost certainly, unavailing to the appellants.
As to that .part of the cross bill against Clay, as Mor-Ison’s executor, which seemed to seek a,decree against him as the executor of Hart, for the alleged conversion, by him in the latter character, of a small portion of the property which had been previously conveyed in trust ^or benefit ’of the appellants, we shall only suggest that the Circuit Court did not err in dismissing that also: first — because the trustee having a legal right to that , . , n ° , - property, there was no ground tor going into a court oi equity; and therefore, as ,to that matter the Court had ,. , . . . no jurisdiction; secondly — because, as the claim to *187 damages on that ground was altogether unconnected with the equity asserted in the cross bill against play, as Morrison’s, executor, those two distinct matters in different rights could not be joined, and the first could not be litigated by the cross bill which could only bring up matter growing out of that of Clay’s bill.
A matter concluded by the dismissal of a bill, cannot be retried in another suit.
And as to Hunt, who is a party also in this case, we will only observe that, the claim now re-asserted by the appellants against him, however just it may once have been, was concluded by the decree dismissing, as to him, the first cross bill which necessarily included and determined this matter, now again set up. We are, therefore, of the opinion that there was no. error in dismissing this last cross bill as to Hunt.
And lastly, we are of the opinion that, even if Morrison’s purchase of the absolute title to the slaves should be deemed fraudulent in law as to the appellants, and therefore, as to them void — and which is at least very questionable — still, as that contract seems to have been made in good faith, and upon a full and valuable consideration, and as, moreover, no decree which could now be rendered consistently with the principles of this opinion, could be both just to him and Pindall, and availing to the appellants, they should not now, by a decree for a useless end, disturb the title or the contract as adjusted fairly by Garret, Pindall and Morrison, without wrong or prejudice to any one.
Wherefore, the decree of the Circuit Court must be affirmed.