CHIEF JUSTICE SIMPSON
delivered the otinion of the court:
On the 19th of May, 1852, W. W. Throckmorton, by a deed of that date, sold and conveyed absolutely to William D. Tinsley the tract of land upon which the grantor resided, seven slaves, a considerable quantity of personal property, and his entire *400 stock of merchandise. The consideration recited in the deed was nine thousand and seventy-five dollars.
On the same day he executed to Tinsley, as trustee for his creditors, another deed, conveying to him all the residue of his real and personal estate, together with all his choses in action, and all the debts and accounts due to him.
In June, 1852, R. H. Short, one of the creditors enumerated in the deed of trust, filed his petition in equity, in which he alleged that the deeds aforesaid were fraudulent, and resulted from an illegal combination between Throckmorton and Tins-ley, to cheat and defraud the creditors of the former. He also annexed to his petition several interrogatories to which he required Tinsley to respond, and by which he was called upon to state specially and particularly the nature and character of the consideration upon which the absolute sale and conveyance was founded.
Tinsley filed his answer, in which he positively denied the fraud with which he was charged, insisted that his purchase was fair and bona fide, and in answer to the interrogatories, set out specifically and at large the different items which constituted the consideration recited in the deed.
A good deal of testimony was introduced by each of the parties. The court below decided that all the property contained in the absolute deed of conveyance to Tinsley should be sold, but that the latter, out of the proceeds of the sales, should be first paid the amount which Throckmorton owed him.
From that judgment Short has appealed, and contends that the purchase by Tinsley was fraudulent, and the court erred in adjudging that he should be first paid out of the proceeds of the sales of the property the amount which Throckmorton owed him. Tinsley, by his cross-appeal, insists that his purchase was valid, and that the judgment directing a sale of the property is prejudicial to him.
Throckmorton having died during the pendency of the suit, the deposition of his wife was taken by the plaintiff after his death; but being excepted to by the defendant, Tinsley, was excluded by the court. The propriety of this decision of the court is the first question presented for our consideration.
*401 The principal part of the deposition consists of communica-. tions made to the witness by her husband in his lifetime. This part of it was clearly incompetent testimony. By the 670th section of the Code of Practice, husband and wife are declared incompetent to testify for or against each other, or concerning any communication made by one to the other during the marriage, whether called as a witness while that relation subsists or afterwards. This also was substantially the common law rule upon the subject. (1 Greenleaf sections 336-7-8, and notes to each section.)
Such facts, however, as the witness deposed to of her own knowledge, which tended to prove that the sale made to Tins-ley by her husband was fraudulent, were admissible as evidence, notwithstanding she was a distributee of her husband’s estate, so far as they operated alone upon the claims and preferences of the creditors. She had an interest in establishing the fact that her husband did not owe Tinsley anything, because the establishment of that fact would render the estate of her husband solvent, and leave something for distribution after the other debts were paid. But she had no interest in deposing to such facts as tended to show that the sale to Tinsley was fraudulent, whereby the conveyance to him would be vacated, and yet he would still remain a creditor to the amount of the debt which Throckmorton owed him. Although, therefore, her whole testimony was excluded by the court below, we will, in considering the questions that arise in the case, regard so much of it as competent as consists of facts to which she deposes of her own knowledge, not derived by communications from her husband, and which only tend to prove fraud in the sale, and not ■ to diminish the liability of her husband’s estate to Tinsley, as one of his creditors.
All the statements made by Throckmorton, after he made the sale to Tinsley, were properly excluded by the1 court as incompetent testimony against the latter. Neither were the statements made by the former, previous to the sale, in relation to his state of indebtedness, or in reference to the payments he had made to Tinsley, or to the amount he owed him, competent evidence against the latter for any purpose, he not having been *402 present at the time such statements were made. This evidence was, therefore, also properly excluded by the court below as inadmissible, so far as Tinsley was concerned.
Independently of the excluded testimony, the only evidence offered which had a direct tendency to establish the existence of actual fraud in the transaction on the part of Tinsley, was that which related to two of the items of indebtedness from Throckmorton to him, which, as he alleged in his answer, constituted a part of the consideration for the sale of the property embraced in the deed. One was a note for eleven hundred dollars, and the other a note for fifteen hundred dollars.
That the notes for these two items, which were on file in the suit, were actually fabricated by Throckmorton, after the action was commenced, is made perfectly manifest by the proof in the cause. It does not follow, however, that it was done by him with the assent or knowledge of Tinsley. When the debts were paid off by the sale of the property to the creditor, it was natural and proper that he should havé surrendered up to his debtor all the notes or other evidences of debt which he held upon him, so far as the debts had been thus paid. When these notes were returned to Tinsley, to be used by him in this action, the two notes above mentioned, which Throckmorton had made for the purpose, were substituted by him in lieu of the genuine ones, if any such had ever existed. It therefore becomes necessary to inquire whether any such notes were ever really executed by Throckmorton ?
On this point the answer of Tinsley to the interrogatories propounded by the plaintiff becomes very material, and has an important bearing in favor of the former. This answer has itself the effect of a deposition, and is, so far as these two debts are concerned, fully sustained by the other evidence in the record. The consideration upon which these liabilities were founded is clearly shown by the testimony; and when the exact correspondence in dates and amounts is considered, there can be no reasonable doubt entertained that such debts really existed. Throckmorton may have had a secret object of his own, which he wished to accomplish, by substituting a copy of the notes for the originals. The notes, when returned, were *403 banded to Tinsley’s lawyer, who was then engaged in preparing an answer for him, and they were filed by the lawyer, with the answer, among the papers of the suit. Tinsley may have taken it for granted that the real notes had been sent back to him, and have permitted them to be filed under that belief, without subjecting them to an examination. Indeed, the proof tends to show that he did not examine them, but left them in - the possession of his lawyer, who placed them among the papers of the suit.
Upon a careful examination of all the testimony in the cause, we have arrived at the following conclusions:
1. That there was no actual fraud in the sale which Throck-morton made to Tinsley.
2. That the possession, except as to the stock of goods, did not accompany the sale, or at least, that the change of possession, if any occurred, was not of that character which the law requires on an absolute sale of personal property. The sale was therefore constructively fraudulent, so far as the slaves and other personal property were concerned, except the stock of goods, the possession of which was taken by Tinsley immediately after the sale was made.
3. Although the testimony with respect to the value of the property sold is •conflicting, yet we are of opinion that its value exceeded to some, although to not a very considerable extent, the consideration paid for it. To that extent the conveyance should be considered voluntary, and therefore constructively fraudulent as against existing creditors; although the inadequacy of consideration is not so great as to create a presumption of actual fraud.
Upon this state of case the question arises, what, disposition, should be made in a court of equity of the deed of conveyance by Throckmorton to Tinsley? Should it be regarded qpd treated as absolutely void, or should it he permitted to stand as, a security for the sum really due from, the grantor to the-grantee ?
The continued possession of real estate by the vendor, after an absolute sale and conveyance, does not render the conveyance fraudulent per se, as it does in the case of personal estate. *404 (Waller vs. Todd, 3 Dana, 510; Dyne vs. Bank Ky., 5 J. J. Marshall, 545.)
The sale of the land and of the stock of goods is therefore valid, and to that extent_ the deed of conveyance should undoubtedly be permitted to stand as a security for the purpose of reimbursement or indemnity.
In respect to the consideration of conveyances, there is an important difference between the way they are regarded at law and in equity. At law, a security or conveyance is wholly good or wholly bad; but in equity, when a security or conveyance is set aside as constructively fraudulent, it is upheld in favor of one not guilty of any actual fraud to the extent of the actual consideration, and is vacated only as to the excess. (McMeekin vs. Edmonds and wife, 1 Hill’s Chancery, 288, 294 ; Anderson, &c., vs. Fuller, &c., 1 McMullan’s Equity, 27; Boyd vs. Dunlap, 1 Johnson’s Chancery Rep., 478; Peacock vs. Evans, 16 Vesey, 514.)
In the above mentioned case of Boyd vs. Dunlap, it was said by Chancellor Kent, that “ a deed fraudulent in fact is absolutely void, and is not permitted to stand as a security for any purpose of reimbursement or indemnity; but it is otherwise with a deed obtained under suspicious or unequitable circumstances, or which is only constructively fraudulent.”
It has been generally decided that the fact that the possession of personal chattels remained with the vendor, after an absolute sale, rendered the sale fraudulent and void as to creditors, and no distinction has been made between the effect which ought to be allowed to such a sale at law and in equity. And such sales may, in some cases, have been treated as absolutely void in a court of equity.
But this court has been inclined to make the question of fraud depend exclusively upon the intention, where it has not been bound down by precedent to adopt a different principle. The arbitrary doctrine that the purchase of the absolute title to personal property, without a corresponding change in the possession, shall necessarily be per se fraudulent as to a creditor of the continuing possessor, should not, as was said by this court in the case of Daniel, &c., vs. Morrison’s Executors, (6 *405 Dana, 185,) be extended to any case to which it has not been hitherto authoritatively extended.
And in the case of Hundley vs. Webb, (3 J. J. Marshall, 652,) it was said by the court in reference to sales of this description, that a purchase may be perfectly fair, but according to its legal character, it will be fraudulent.
There does not seem to be any good reason why cases in which no actual fraud exists, but which are deemed fraudulent in law, merely because the possession of personal property has remained with the vendor for some time after the sale, should not be treated in a court of equity as other cases of constructive fraud. In a court of law they must, it is true, be deemed to be absolutely void. But in a court of equity, where the chancellor can do complete justice to all parties, and where the intention with which an act is done determines in a great measure the character of the transaction, it is right and proper to discriminate between cases of actual fraud and cases that are merely fraudulent in law, in consequence of some arbitrary rule which has been adopted for the suppression of fraudulent practices, and has been inadvertently violated or disregarded.
The rule of constructive fraud which we are considering was adopted for the security of subsequent creditors and purchasers, who might be deceived and deluded by the possession remaining with the vendor, as the possession of personal property is evidence of ownership. Its operation, it is true, has been extended to pre-existing as well as to subsequent creditors; but the former cannot complain, as the latter might do, of actual injury having resulted from the failure of the vendee to take the property into his possession, and they dealt with the vendor without notice'of the sale.
When a purchase has been fairly and honestly made, but the sale is deemed fraudulent in law, because the vendee did not immediately take into his possession the property purchased, it would be a case of great hardship, if not of injustice, not only to deprive the vendee of the benefit of his purchase, but also of the price paid, by refusing to let the conveyance stand as a security for his indemnity and reimbursement. Such hardship *406 a court of equity ought not to be instrumental in imposing, when it has the power to lend its aid solely upon the condition that the plaintiffs shall do equity, in order that they may receive it themselves.
In this case, although the slaves and personal property on the farm which Tinsley purchased were permitted to remain there, yet they were under his control, and labored for his benefit. And were it not that Throckmorton resided upon the farm at the time of the sale, and part of his family still continued to reside there afterwards, although he and his wife went away on the following day, and were absent several months, the change of the possession might be regarded as sufficient to free the sale from the imputation.of constructive fraud. Besides, there was nothing in the manner in which the property was held, managed, and disposed of after the sale, which tended to impart to the failure to make an open and visible change of the possession the character of actual fraud.
As then there was no actual fraud on the part of Tinsley, the purchaser, and as the plaintiff was a pre-existing creditor, and could not therefore have sustained any special injury by the conduct of the vendee in failing to make an open an visible change in the possession of the property; and as the deed by which the sale was made was recorded immediately after its execution, by which the fact that the property had been sold was made known to the public, we are of opinion that the court below did not err in deciding that the consideration of the purchase made by Tinsley should be first paid out of the proceeds of the sale of the property.
As the land and the stock of merchandise, the sale of which was valid, were insufficient to reimburse the purchaser, the judgment directing all the property to be sold was not to his prejudice, inasmuch as he was to be first paid out of the proceeds of the sale. And as the sale of part of the property was constructively fraudulent, as the aggregate value of all the property exceeded, to some extent, the price paid for it, and as it is evident from the circumstances of the purchase that it was made for the sole purpose of securing to the purchaser the *407 debt which the vendor owed him, the court did not err in adjudging a sale of the property.
Wherefore, the judgment is affirmed on both the original and cross-appeals.