CASE 93—PETITION EQUITY—MAY 27.

# Whitaker vs. Garnett, &c.

# Same vs. Doan, &c.

### APPEALS FROM CARROLL CIRCUIT COURT.

1. Mortgages made alone to secure simultaneously created liabilities, although made in contemplation of insolvency, are not denounced by the act of March 10, 1856, and will not inure an assignment to the benefit of general creditors.

2. Mortgages made to secure previously existing debts, no matter how insignificant in amount, if made in contemplation of insolvency, will inure a legal assignment of the mortgagor's estate to the benefit of all his creditors, and this cannot be prevented by including in it simultaneously created liabilities, though these latter were in reality the moving cause and the almost only incentive to the mortgage. Yet, in *distributing the assets of the debtor, the mortgagee* should be regarded as a *preferred creditor* on all simultaneously created liabilities—these do not fall within the denunciation of the statute.

3. Attaching creditors acquire no prior lien by virtue of their attachments when the property and effects of the debtor are held to have inured to the benefit of all his creditors under the provisions of the act of March 10, 1856. (1 *Stant.*, 553; *Shouse vs. Utterback*, 2 *Met.*, 53; *Given, Haynes & Co. vs. Gordon*, 3 *Met.*, 539.)

4. When a conveyance is set aside for constructive fraud—legal fraud—the known and well established rule of equity is, to give preference for the actual outlay to the holder of the legal title.

5. Statements and recitals in a deed, as a general rule, are evidence between the parties and privies, but not against strangers for any purpose.

6. When a deed is attacked as fraudulent, there should be other evidence than the mere recitals in the deed to establish a valuable consideration paid.

7. A deed being attacked as fraudulent, and no other evidence than the recitals in the deed being offered to show that a valuable consideration was in good faith paid, the deed is held to be fraudulent and set aside—it also appearing that the grantor actually intended to defeat

a portion of his creditors, and that he was in intimate business and personal relations with the grantee, who was at the time his heavy indorser.

T. W. Brown,
John M. Harlan,
John Rodman, and
G. W. Craddock,                                    For Appellant,
                      CITED—
    Civil Code, secs. 369, 371, 373, 579.
    Act of February 9, 1864, Myers' Sup., 506.
    Act of March 10, 1856.
    2 Bush, 289; Oneil, &c., vs. Miller, &c.
    4 Met.; Pottinger vs. Millet.
    Revised Statutes, chap. 40, sec. 1, 1 Stant., 445.
    2 Dana, 324; Violett vs. Violett.
    12 B. Mon., 38; Ratcliffe vs. Trimble.
    1 Met., 405; Short vs. Tinsley.
    1 Met., 458; Terrill vs. Jennings.

W. B. Winslow,                                     For Appellees.

T. N. Lindsey,                              For Bank of Kentucky.

A. J. James,                               For Farmers' Bank.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

November 28, 1859, John W. Dean, by deed, conveyed to W. C. Whitaker his dwelling-house and lot in the town of Carrollton, his farm of one hundred and fifty acres, and a piano-forte, and covenanted to give possession of the realty January 1, 1860, which deed was lodged and properly acknowledged for record in the proper office the day after it bears date, the consideration, as recited therein, being six thousand five hundred dollars cash paid.

April 4, 1860, Wesley Dean mortgaged to Whitaker three hundred and thirty-eight acres of land, several slaves, and sundry articles of personalty, which was duly

acknowledged and lodged in the proper office the day it bears date, the recited consideration being eight thousand one hundred and sixty-four dollars cash loaned him by Whitaker, and the further consideration of Whitaker becoming his security in a note of same date, payable to A. D. Hunt & Co., for two thousand nine hundred and thirty-three dollars, at four months' time; also, becoming bound as security in a note of same date at one hundred and sixteen days, payable to the Southern Bank of Kentucky, for one thousand one hundred and thirty-three dollars and twenty-four cents; also, another note to said bank for two thousand five hundred and eighty-one dollars, at one hundred and sixteen days; also, becoming bound as his security in a note of that date to Farmers' Bank of Kentucky for three thousand and ninety-three dollars and forty-five cents, at one hundred and sixteen days. ,

A. H. Lathrop, J. W. Dunn & Co., Daniel Cox, and Nicholas Vineyard, being several creditors of J. W. Dean, December 5, 1859, filed several petitions, and obtained attachments thereon, against said Dean and his property, and had them levied upon the one hundred and fifty acres of land, house and lot, and piano mentioned in the deed to Whitaker of November 28. Subsequently, they filed amended petitions, attacking said deed as fraudulent, and averring that no such consideration as therein set out was ever paid, but that it was a fraudulent combination to cheat, hinder, and delay J. W. Dean's creditors.

Whitaker answered each, denied the fraud, averred the deed was executed to him in good faith, and upon the consideration recited.

J. W. Dean also answered and denied the material allegations of fraud, &c., and avers the consideration was paid *bona fide*, as set out in the deed.

J. F. Doan, who was made a defendant, sets up a mechanics' lien on the land for two hundred and twenty-four dollars and twenty-five cents.

May 28, 1860, W. D. Alexander, W. D. Allen, and S. W. Eggleston, also being creditors of J. W. Dean, instituted their joint action in equity, in which they charge that said conveyance to Whitaker was made by J. W. Dean in contemplation of insolvency, and with a view to prefer some of his creditors to the exclusion of others, contrary to the statute of 1856, and therefore it inured to the benefit of all his creditors *pro rata*.

June 2, 1860, J. V. Conn, Wm. Cox, and A. G. Crane & Co., each being judgment creditors, with a return of *nulla bona* on executions of Wesley Dean and J. W. Dean, brought separate suits against Whitaker, Wesley Dean, and J. W. Dean, to subject the lands mortgaged by Wesley Dean to Whitaker to the payment of their debts; and charge that the mortgage was made for the fraudulent purpose of hindering and cheating Wesley Dean's creditors, deny that the money recited therein as borrowed was ever loaned by Whitaker, nor that the liabilities therein set out were ever secured by his becoming bound therefor.

They pray that Wesley Dean discover his assets; that the mortgage be adjudged fraudulent, and the property subjected to the payment of their debts; but if this cannot be done, that it then be adjudged as having been made in contemplation of Wesley Dean's insolvency, and to secure some of his creditors to the exclusion of others, and held to inure to the benefit of all. Whitaker and Dean severally answered each petition separately, and deny all fraud; aver that it was a real and *bona fide* mortgage for the consideration recited.

The Farmers' Bank also, by her suit, attacked this mortgage as being made in contemplation of Wesley

Dean's insolvency, and to prefer some to the exclusion of others of his creditors, and in contravention of the statute of 1856, and prays that it be so held; but if not, that then it be declared as fraudulent. Whitaker and Dean also take issue with her.

Upon final hearing, the court held that both the deed from J. W. Dean, and mortgage from Wesley Dean to Whitaker, were fraudulent, and set them aside and gave priority to the several attaching creditors, according to the dates of their respective proceeding. Subsequently, May 2, 1865, Whitaker filed his petition for a new trial as to both, substantially averring that he was, from the beginning to the end of the late civil war, an officer in the military service of the United States, on active duty, and was, by reason thereof, wholly precluded from giving any personal attention to said suits; and was so engaged at the term of the court at which the judgments were rendered; that previously, and whilst in front with his command, he had prepared an affidavit that he was then in the army, and asking that his cases be continued, which he believes was presented to the court and filed. That he had prepared another affidavit and sent by J. L. Scott, at the term at which the causes were tried, to be filed, setting out his then military engagements, which precluded his attendance; but that said Scott was prevented from attending said court on account of the presence in the country of guerrillas, which also rendered it unsafe for him to go in person; that his two only original counsel, and who were familiar with the case, were both absent—both gone South, and one in the Southern army; that, by reason thereof, he was left without counsel to attend to his case, whilst he was in the army himself; that he never heard of the judgment until after the court had finally adjourned the term;

that his defense was valid, and he could make it good; but that, by surprise and unavoidable misfortune, he had not. To this petition the judgment creditors responded.

The court dissolved his injunction, which was reinstated by one of the appellate judges; but, on final hearing, the court again dissolved his injunction and dismissed his petition.

Whitaker has appealed from all of these judgments, and three questions are naturally involved:

1. Was the court right in setting aside the deed of J. W. Dean to him?

2. Was the court right in holding the mortgage from Wesley Dean to him fraudulent?

3. Was the judgment dismissing his petition for a new trial and dissolving his injunction right?

As to the mortgage, it is proved in the case that a note for eight thousand one hundred and sixty-four dollars was executed by Wesley Dean to Whitaker for "loaned money," dated April 4, 1860, due in three years, with interest. This note is, in the record, attested by two witnesses. It is further proved, that Whitaker got ten thousand dollars of Brannin & Summers, April 4, 1860, on a bill drawn by Whitaker & Brown, on Hilliard, Summers & Co., of New Orleans, to whom they had been and were sending hay, and that Whitaker deposited, as collateral security for this advance, eighty-nine shares of bank stock. Nor is the importance of these facts reduced by the fact that J. W. Dean and Whitaker had previously been partners in the hay trade, as that partnership had ceased the previous autumn, at least their account had been finally closed with Hilliard, Summers & Co., as proved by Brannin.

It is proved that Whitaker got eight thousand dollars of this advancement the day of the mortgage, and that

it was loaned to, and large amounts were paid out on account of, Wesley Dean.

The A. D. Hunt & Co. debt of eight thousand dollars, in which Whitaker was the accommodation drawer for J. W. Dean, the acceptor, with Wesley Dean, the indorser, was partially paid the same day, and the remainder renewed, with Wesley Dean as principal and Whitaker security.

There was a note for two thousand five hundred and eighty-one dollars, as described in the mortgage, in which Wesley Dean was principal and Whitaker security, presented to the Southern Bank, but which it finally refused to discount, about April 22, and, therefore, it really did not become, as was contemplated by the parties, any part of the mortgage debt, and reduced the mortgage liability that much.

The note described as payable to the Farmers' Bank was subsequently discounted by that bank, and went to liquidate a debt of J. W. and Wesley Dean, in which Whitaker was no party, nor in any manner liable.

There is certainly no moral turpitude in the transactions manifested by the evidence; therefore, no such fraud as to vitiate the mortgage.

The only serious question is as to whether it comes within the purview of the statute of 1856. Much of this money loaned went to pay liabilities that Whitaker was under for J. W. Dean; and, before becoming bound for such debts, he had taken the guaranty of Wesley Dean to indemnify him for all liabilities he should incur as J. W. Dean's security. And this was, doubtless, a strong reason why Wesley Dean should be willing to mortgage his entire property. so heavily to pay J. W. Dean's debts; because he was under both a moral and legal obligation to Whitaker to save him harmless. J.

W. Dean had failed, and Wesley Dean was then greatly embarrassed, and probably was liable for J. W. Dean to a greater amount than the value of his property.

There can, therefore, be scarcely a doubt that, so far as said mortgage was made with a view to liquidate the debts of J. W. Dean for which Whitaker was bound, and for which Wesley Dean was bound to indemnify him, it falls within the objects and purposes of the statute of March 10, 1856. (1 *Stanton's Revised Statutes*, 553.)

As some part of the consideration of said mortgage was not to secure debts for which Whitaker was in any manner liable, but the mortgage and creation of his liability were cotemporaneous and simultaneous acts, it involves a triple aspect of the question, whether all the property should be distributed *pro rata* among the creditors; or whether Whitaker should be adjudged a prior lien; or whether it should be distributed equally among the creditors so far as it was made to give preference for existing liabilities, and so far as it was simultaneous with the creation of liabilities, priority to Whitaker should be adjudged *pro rata*, according to the amounts of these respective classes of claims.

The securing of a *bona fide* debt or getting indemnity for liability as security, so far from being regarded by the common law as unconscientious, was upheld as founded upon a valuable and pure consideration, and as a reward to a vigilant creditor; and but for our positive statute making such mortgages, given in contemplation of insolvency and with a view to preference, inure to the benefit of all the creditors *pro rata*, such mortgage could not be disturbed. The saving in the statute is as follows: "*but nothing in this section shall vitiate or affect any mortgage made in good faith to secure any debt or liability created simultaneously with such mortgage.*"

In *Terrill vs. Jennings et al.* (1 *Met.*, 452), this court held, that a mortgage to secure a previous existing debt made in contemplation of insolvency would necessarily operate to the exclusion of other creditors, and was, therefore, such an act as transferred all the debtor's property instantly to the benefit of all his creditors; and this effect could not be prevented by connecting with it objects within the saving of the statute. And in said case it was also decided, that if the debt previously existed, but the evidence thereof should bear even date and be simultaneous with the mortgage, it would be equally within the operative purposes of this enactment. Tested by these rules, the mortgage from Wesley Dean to Whitaker must be regarded·as inuring to the benefit of all Dean's creditors. And though most of them sought to set aside the mortgage as fraudulent, and to acquire prior liens by their attachments, yet the Farmers' Bank sought to bring it within the operative effect of this statute; and the constructive effect of the mortgage being to transfer all his property equally to all his creditors, a· portion of these could not, by attachments, deprive the others of their legal rights of distribution; but upon the proceeding of any creditor, the effects of such debtor will be equally distributed, as virtually decided in *Shouse vs. Utterback*, 2 *Met.*, 53; *Given, Haynes & Co. vs. Gordon*, 3 *Met.*, 539.

As before stated, this mortgage being to secure *bona fide* liabilities, it could not be attacked at common law, nor even under our statutes, previous to this enactment of 1856; and, therefore, it can be successfully assailed only so far as it conflicts with this last enactment.

The first provision in said statute denounces mortgages made to prefer one creditor to the exclusion of others, made in contemplation of insolvency, but excepts

from this general provision such mortgages as shall be made to secure *bona fide* liabilities created simultaneous with the mortgage. In other word, it only alters the existing statutes and laws so far as to make all attempts to prefer pre-existing liabilities, when done in contemplation of insolvency, inure to the benefit of all the mortgagor's creditors.

If such mortgages be made alone to secure simultaneous created liabilities, no matter if in contemplation of insolvency, they are not denounced by the statute, nor will such inure an assignment to the benefit of the general creditors.

Whilst such mortgages made to secure previously existing debts, no matter how insignificant in amount, if done in contemplation of insolvency, will inure a legal assignment of the debtor's estate to the benefit of all his creditors; and this cannot be prevented by including in it simultaneously created liabilities, though these latter were, in reality, the moving cause, and the almost only incentive to the mortgage; yet, in distributing the assets of the debtor, the mortgagee should be regarded as a preferred creditor on all such liabilities as do not fall within the denunciations of the statute; and to make him forfeit the security for such claims as he could legally have preferred, because some were included which could not legally be so secured, would be to adjudicate a forfeiture which neither the letter nor spirit of the statute has provided, and to inflict a punishment inconsistent with the rules of equity; for, even to secure a pre-existing debt, is not actually vicious, but, at most, under said statute, is only a constructive legal fraud, which causes the security to inure alike to all the creditors; and for such frauds, the known and established rule of equity is, to give preference for the

actual outlay to the holder of the legal title, when it is set aside for a constructive legal fraud. Had Whitaker taken a mortgage to secure the simultaneous created *bona fide* liabilities of Dean to him, and the same day taken another to secure his previously created liabilities, the latter would have inured to the benefit of all of Dean's creditors; but Whitaker would have been a preferred creditor under his first mortgage, because the liabilities which it secured would not fall under the denunciations, but within the exceptions of the statute. These two classes of debts being in the same instrument, cannot alter the rights of the parties, nor make the rules, by which these are to be adjudicated, different; for this would be to fix their rights and equities upon the formalities of the conveyances, rather than the substantial transactions and intent of the parties.

Nor is there anything in Jennings and Terrill's case, 1 *Metcalfe*, conflicting with these views.; it was there decided, that as the mortgage professed to secure a pre-existing small debt, this would bring it within the denunciations of the act of 1856, notwithstanding the large debt was evidenced by a note of even date with the mortgage; but the court shows, with much force and reason, that the latter debt also had a prior existence; hence, it also fell within the general provisions and not the exception of the statute; therefore, no question of priority arose, or could arise, in the case, as to *bona fide* claims created simultaneously with the mortgage.

We are satisfied, therefore, that, so far as Whitaker *bona fidely* loaned to Dean money, and incurred new responsibilities for him, in which he was not previously liable at the time of the mortgage, he should be regarded as a preferred creditor.

The deed from J. W. Dean to Whitaker, which purports to be an absolute sale for a valuable consideration paid, must be governed by other principles.

The evidence is very clear that J. W. Dean desired to defeat a particular class of creditors to whom he thought he had become bound through the wrongful agency of his partner; and, with a view of defeating this class of creditors, he had been, and was, disposing of his property. What he said and did, however, is only evidence against himself and not against Whitaker. As there was no evidence on the first trial to establish any valable consideration paid by Whitaker other than the recitals of the deed, it is insisted that these are sufficient and must stand until disproved.

As said by this court in *Edwards vs. Ballard* (14 *B. Mon.*, 290), statements and recitals of facts in a deed, as a general rule, are evidence between the parties to it. But not so where third parties are concerned, and the fact to be established affects the validity of the title; that, whilst such recitals are binding on parties and privies, yet, as a general rule, such recitals cannot be used as evidence against strangers for any purpose.

This was in a case where a subsequent vendee was attempting to recover the property from a previous vendee, holding under a fraudulent conveyance; and, in order to a recovery, it was essential to prove a valuable consideration paid by the plaintiff, and he relied upon the recitals of his bill of sale to establish the fact.

When it is established that the vendor is pursuing a line of conduct professedly with a view to defeat his creditors and to secure his property from their claims, and when a deed is attacked as fraudulent, it would seem but just and reasonable that there should be other

evidence than the mere recitals of the deed to establish a valuable consideration paid.

In the absence of all proof of a fraudulent intent, or fraudulent motive, in the vendor, the instrument of conveyance and its recitals are sufficient to uphold· it. There is, however, always a motive, as said by the court in *Edwards vs. Ballard*, on the part of a fraudulent vendor to state a consideration received. Indeed, the motive that prompts the conveyance will always be sufficient to induce a statement of the essential facts to sustain it.

Whitaker's intimate business and personal relations with J. W. Dean, and his being bound for large sums as his indorser, raises the presumption that he knew, to a considerable extent, of Dean's embarrassments, and rendered it the more important to him to establish the payment of the consideration.

The permitting the piano to remain in Dean's possession is but a slight circumstance, further than its particular value, as it has never been held that actual possession of real estate was essential to uphold the conveyance, but not so as to personalty.

Regarding the facts of Dean's embarrassment, his actual intention to defeat a portion of his creditors, the intimate business and personal relations of the parties, and the fact that Whitaker was a heavy indorser for Dean, without any evidence than the recitals of the deed that a valuable consideration was *bona fidely* paid, we cannot say that the court erred in setting it aside.

These causes had been elaborately prepared, briefed by both parties, and, perhaps, argued and submitted for hearing December 6, 1860, but were not decided until ·———— term, 1865 ; still no motion had been made in the meantime for a re-argument or a re-opening of the

case for other evidence; and no reason is perceived why it was necessary for either party to be present, or why any motion for a continuance should have been made. On the petition for a new trial, only the additional evidence of the vendors themselves was taken, and as no legal cause for a new trial was made out, this evidence was wholly unavailing.

Wherefore, the judgments as to the setting aside the deed from J. W. Dean to Whitaker and dismissing the petition for a new trial are affirmed; but the judgment as to the mortgage from Wesley Dean to Whitaker is reversed, with directions for further proceedings in accordance to this opinion. All those appellees who assailed the conveyance from J. W. Dean to Whitaker will recover their costs against Whitaker in this court; and W. C. Whitaker will recover his costs against all those who assailed the mortgage to him from Wesley Dean, and who obtained judgment setting it aside.