CASE 100.—ACTION BY MARTIN FROELICH, &c., AGAINST
MARY WILLETT, &c., TO SET ASIDE CERTAIN
CONVEYANCES AS FRAUDULENT.—January 24,
1906.

# Willett, &c. v. Froelich, &c.

Appeal from Daviess Circuit Court.

From the judgment the defendant appeals.—Reversed.

1. Fraudulent Conveyances—Setting Aside—Actions—Pleading
   [Complaint—Sufficiency.—In order to set aside under the stat-
   ute, a conveyance of property by a debtor, made with intent
   to defraud future creditors, such creditors must both allege
   and prove the fraudulent intent.

2. Same—Rights of Grantee—Credit for Purchase Money.—
   Where both the grantor and grantee of land were guilty of
   actual fraud as to creditors of the former in the transaction
   the grantee was not entitled, on the setting aside of the con-
   veyance, to a return out of the property of the purchase
   money paid by him.

3. Same—Sufficiency of Evidence.—In an action to set aside a
   conveyance as fraudulent as to creditors of the grantor, the
   grantor's son-in-law, to whose wife the conveyance was made,
   testified that on the day of the execution thereof the grantor
   said to him that he desired to go to a certain city to be treat-
   ed for an abscess, and for that reason desired to sell out;
   that thereupon the selling price of $2,000 was paid over on
   delivery of the deed; that the money was the proceeds of
   the son-in-law's savings for several years; that he had kept
   the same in his wife's trunk most of the time. He lived with-
   in five miles of a city in the banks of which he frequently
   had had money on deposit, was used to banks and expressed
   no fear of the banks being unsafe, stating that he kept the
   money in the trunk to avoid payment of taxes on it. Al-
   though the grantor's medical treatment required a small
   sum, the conveyance covered everything he had. The son-
   in-law testified that he paid the money over to the grantor at

the county clerk's office, but one of his witnesses stated that the money was paid at home. During the time the son-in-law kept money in the trunk he was under obligations to pay off a mortgage on the conveyed premises of $1,000, drawing interest at 6 per cent. It also appeared that immediately after completing the transaction the grantor left the state and that his whereabouts were unknown. Held, sufficient to show actual fraud in the conveyance.

G. W. JOLLY and LITTLE & SLACK, for appellant.

WILFRED CARICO, for appellee.

OPINION OF THE COURT BY JUDGE BARKER.—Reversed on direct and cross appeals.

Frank Schank owned a small farm with a dwelling-house and the other ordinary farm improvements thereon situated in Daviess county, Kentucky. He was indebted to the Daviess County Bank and Trust Company in the sum of one thousand dollars, secured by mortgage upon his farm. On the 30th day of March, 1903, he and his wife, Barbara Schank, conveyed to their daughter and only child, Mary Willett, the wife of the defendant, Pat L. Willett, thirty-six acres, being one-half of the farm, on consideration that they assume and pay off the mortgage to the trust company. Afterwards, he borrowed several sums of money for which he executed notes aggregating five hundred dollars or more, with the appellees as his sureties. On the 25th day of July, 1903, he and his wife conveyed to their daughter, Mary Willett, the balance of the farm, together with all the live stock, provender and crops thereon, upon the recited consideration of two thousand dollars cash; after which he immediately left the State, and, so far as the record shows, his whereabouts are unknown. His wife remained with her son-in-law and daughter wholly

unprovided for, her husband having, it is said carried
with him the entire sum which it is claimed he was
paid for the farm.  The appellees, who as said before,
are his sureties on his various notes, instituted three
actions in equity (afterwards consolidated) to have
both conveyances declared null and void for fraud, it
being alleged that no money was paid as a considera-
tion for the conveyances, and they were made for the
purpose of defrauding appellees and the other credi-
tors of the grantor.  Pat L. Willett and his wife,
Mary, the grantees in the deeds, filed their answer
denying all of the material allegations of the petition,
thus completing the issues.  A trial being had, the
chancellor held that both conveyances were fraudu-
lent as against the rights of the appellees, but that
Pat L. Willett, instead of two thousand dollars, had
paid the sum of eight hundred dollars, and the land
was ordered to be sold, and out of the proceeds there
was to be paid, first, the thousand dollar mortgage of
the trust company (which is not disputed), and then
the sum of eight hundred dollars paid by Pat L. Wil-
lett; and out of the remainder, the indebtedness for
which appellees were sureties was to be paid.  From
this judgment both parties have appealed.

It is not disputed that the conveyance of March
30th, 1903, was made prior to the time at which appel-
lees became the sureties of the grantor, and as
there is neither allegation nor proof that the time
it was made, he had any intention of defrauding the
appellees, we do not understand upon what ground
it can be set aside at their suit.  Undoubtedly, if one
contemplating becoming indebted makes a fraudulent
conveyance of his property with the intent to defraud
his future creditors, the conveyance  could  be  set

aside under the statute; but in order for the subse-
quent creditor to avail himself of this right he must
both allege and prove the fraudulent intent.

In the conclusion that the conveyance of July
25th, 1903, was fraudulently made, we heartily concur,
and the difficulty we have on this branch of the case
is to understand upon what principal the fraudulent
grantee was allowed credit for the sum of eight hun-
dred dollars, assuming he actually paid it, which we
do not believe; but this question we will dispose of
hereafter.

Pat L. Willett and his wife and children lived in one
room of the small dwelling house on the farm, and
his father-in-law, Frank Schank, and his wife, Bar-
bara, occupied the remaining room, and they had so
resided for several years. The father-in-law is said to
have been addicted to periodical sprees, and is de-
scribed as a rough man when drinking. The testi-
mony of the witnesses as to the value of the farm
varies; those who were introduced by the appellees
place the value of the land at from forty-five to fifty
dollars per acre; those for appellants at from twenty-
five to thirty-five dollars, we are inclined to accept the
valuation of the witnesses for the appellees, al-
though it is not necessary that we should rest our
conclusion as to the merits of this branch of the case
upon the question of inadequacy of price.

We think appellant's own evidence convicts him of
fraud. He states that, on the day, or the day before,
the deed to his wife was made, his father-in-law said
to him, that he desired to go to Evansville to be treat-
ed for fistula, and for that reason desired to sell
out to his son-in-law; that thereupon the selling price
was agreed upon at two thousand dollars cash, the

deed was drawn up, and they went together to the clerk's office of Daviess county, where the deed was delivered and the money paid over. When called upon to account for the possession of so large a sum of ready money he stated that it was the proceeds of his savings for several years, which he had kept in a shoe box in his wife's trunk most of the time, but which, during a part of the time, he had carried around in his pocket. He lived within five miles of Owensboro, and was used to banks and banking; understood how to deposit money and check it out as he needed it, and testified that, during the period he had used the shoe box as a place of deposit, he frequently had money in the bank at Owensboro. He does not show, or pretend, that he ever lost any money by the failure of a bank, or express any sort of fear of their being unsafe. The only reason he gives for keeping the money in a shoe box at home is that he did not have to pay taxes on it, by which, as we under-stand it, he means that he could thus defraud the State of the taxes due it.

It was obvious, of course, to the son-in-law, that the father-in-law did not need more than a tithe of the money said to have been paid him for the farm, for the purpose of going to Evansville to be treated for fistula, and yet he seems not to have been surprised that, for this purpose, the gran-tor was selling out everything he had— the farm, live stock, and his share of the growing crops. Barbara Schank, the abandoned wife, when placed upon the stand in the interest of appellants, stated that the reason she did not go with her husband was that she did not feel willing to go into a strange country. She does not pretend that her husband went to Evansville to be treated for fis-

tula. Probably, if this had been true, she would have gone with her husband in order to be with him and nurse him in his sickness.

One of the witnesses for appellant, Glenn, testifies that he was in the employ of Schank, and saw the son-in-law count out the money to the grantor at the home, and the table was covered with the bills. Willett, himself, testified that the money was paid over to his father-in-law at the county clerk's office. Both of these statements could not be true, and the introduction of false evidence is one of the surest badges of fraud.

The testimony of Willett as to how he saved the money he pretends he paid his father-in-law is very unsatisfactory. In the first place, he gives the gross sums which he received for the crops he says he sold, and the painting he claims to have done, whereas common experience teaches us that the whole of these sums could not have been saved, but only the net profits made by him. For instance, he claims to have raised thirty-five acres of wheat, from which he realized three hundred bushels, his part of the money being about one hundred and forty dollars. We do not think it would require much experience to know that the net profit on a yield of ten bushels to the acre would be very small, if anything. Without pursuing this feature of the evidence further, we close it by saying that, in the computation, appellant makes no allowance for the expense of living for himself and family during the three years in which he claims to have accumulated the two thousand dollars paid to his father-in-law.

It is also a significant fact, that although by the deed of March 30th, 1903, he had assumed to pay off the

mortgage of one thousand dollars, which was draw-
ing interest at the rate of six per cent. per annum,
he allowed this debt to run at interest while he kept
two thousand dollars idle in the shoe box. His coun-
sel say, on this branch of the case, that while this
might be a suspicious circumstance against a banker
or other person who kept a close account of his mone-
tary affairs, it does not necessarily constitute a ground
to suspect the purity of their client's motive, because
he was a man unused to such nice calculations. There
would be a good deal of force in this suggestion if
the learned counsel were not obliged to show that
their client was a man who saved and put away almost
every penny he made, in order to account for his pos-
sessing so large a sum of ready cash. In order to
believe that Pat L. Willett had anything like the
amount he claims to have had in the shoe box, we
must believe that he was a man who looked after his
money affairs with almost miserly parsimony and
care. This disposition is entirely inconsistent with
his allowing an indebtedness of one thousand dollars
to be outstanding against him at interest, while he
kept so large a sum of money idle in the shoe box.

The fact that Willett introduced a witness to show
that, several years before, he saw him give to his
brother eight hundred dollars to keep for him, even
if true does not corroborate Willett's claim to have
had it and paid it over to his father-in-law at the time
of the sale. But even if appellant paid eight hundred
dollars as a part consideration for the purchase, he
was not entitled to a credit upon the conveyance being
set aside for actual fraud. The chancellor must have
reached the conclusion that both Schank and Willett
were guilty of actual fraud as to the creditors of the

former by the conveyance in question. Willett either paid two thousand dollars to his father-in-law, or his testimony on that subject is false. If false, this convicts him of actual fraud. If the chancellor had set aside the conveyance as constructively fraudulent because of the inadequacy of price, then he would have allowed a credit of two thousand dollars—the sum actually paid. The allowance of only eight hundred dollars shows that the chancellor believed the transaction was actually fraudulent, and upon that hypothesis no credit should have been allowed to the fraudulent grantee. Short v. Tinsley, 1 Met., 397; Wood v. Goff's Curator, 7 Bush, 59; Whittaker v. Garnett, 3 Bush, 402; The Diamond Coal Co. v. Carter Dry Goods Co., 20 Ky. Law Rep., 1444.

We think the evidence in this case clearly established the actual fraud of the parties as to the conveyance of July 25th, 1903. The transaction has every badge of moral turpitude. The relationship of the parties, the inadequacy of price, the large sum of money kept for so long a time in the shoe box, the fact that the grantor did not need anything like the sum said to have been paid him for the purpose of securing treatment for the disease it is said he had, the failure of Willett to pay off his assumed indebtedness which was drawing interest when he had a large sum of ready money idle, all conduce irresistibly to the conclusion that the transaction was a fraudulent scheme to defeat the grantor's creditors.

Truth is not only consistent with itself, but likewise with all the facts with which it is surrounded and with which it has relation. In order to make falsehood successfully simulate truth, it is necessary to isolate it from all known and credible surroundings. To illustrate: If Pat L. Willett had kept his money

in a responsible bank, and paid it over to his father-in-law by check, the truth of this payment could have been at once established beyond question by the evidence of the banker and the accuracy of his books. If, on the contrary, he had stated he paid his father-in-law by check on a reputable bank, the banker and his books would at once have disapproved the false statement. In order, therefore, to give the transaction as to the payment of the purchase price of the farm even the semblence of verisimilitude, it was necessary to isolate it from all surroundings, known and credible facts and circumstances; in other words, to isolate it so that it would have to stand or fall upon the evidence of the interested parties. This could not be done more successfully than by keeping the money for a long period of time in a shoe box in the wife's trunk, and when it was taken from thence and placed in the pocket of the grantor, to have him then decamp with it without allowing it to come in contact with any of the ordinary channels by which large sums of money are usually transported from one place to another. This complete isolation of so important a transaction leaves no doubt upon the ordinary mind that the possession and payment of the money was a mere fraudulent fabrication.

For the reasons given the judgment is reversed both upon the direct and cross appeals, with directions to enter a judgment in accordance with this opinion.